# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DARYL DEE WALKER,
　　　*Plaintiff*,

　　　v.　　　　　　　　　　　　　　　　　　No. 3:16-cv-274 (JAM)

LINDA P. KENDRICKS, *et al.*,
　　　*Defendants*.

## ORDER DISMISSING COMPLAINT PURSUANT TO 28 U.S.C. § 1915A

*Pro se* plaintiff Daryl Dee Walker brings this complaint against several correctional officers on grounds that he was wrongly subject to disciplinary segregation, to a transfer between prison facilities, and to humiliating visual body-cavity searches. He asserts constitutional violations pursuant to 42 U.S.C. § 1983 against five defendants: Second Chance Program Manager Linda P. Kendricks, Captain Pittman, Lieutenant Ayala, and Lieutenants John Doe 1 and John Doe 2. Based on my initial review pursuant to 28 U.S.C. § 1915A, I conclude that plaintiff has not alleged a violation of any constitutional right for which the defendants would not have qualified immunity, and therefore I will dismiss the complaint.

### BACKGROUND

The following facts as alleged in the complaint are accepted as true for purposes of this ruling. On December 16, 2015, at Willard-Cybulski Correctional Institution, plaintiff was "apprehended out[side] of E. Dorm by DOC staff." Doc. #1, ¶ 1. Lieutenant John Doe 1 handcuffed plaintiff, escorted him to a holding cell in the admitting and processing area, and performed a visual body-cavity search on him in front of a camera and multiple Department of Corrections staff. Doc. #1, ¶¶ 1–5. Plaintiff "fear[ed] for [his] life, feeling humiliated and sexually violated." Doc. #1, ¶ 8. Staff ordered plaintiff to put on a red jumpsuit, indicating that

he would be sent to segregation. Doc. #1, ¶ 9. Though he twice asked Lieutenant John Doe 1 what he had done to merit a visual body-cavity search, Lieutenant John Doe 1 did not respond. Doc. #1, ¶¶ 2, 10. When plaintiff asked Second Chance Program Manager Linda P. Kendricks why he was going to segregation, he received an insulting but not pertinent response. Doc. #1, ¶ 11. He asked Captain Pittman and Lieutenant Ayala why he was going to segregation; neither defendant knew why. Doc. #1, ¶¶ 12, 13.

While plaintiff was in a holding cell in anticipation of his transfer, DOC staff brought another inmate in who was also to be transferred to segregation. As they were being transferred, plaintiff asked another correctional officer why he was going to segregation, and the officer replied that he was being transferred pending the results of a lab test. Doc. #1, ¶ 16. Plaintiff protested that he had neither been issued a disciplinary report nor undergone a lab test, but plaintiff was transferred nonetheless. Doc. #1, ¶¶ 17–18. He raised the same protest to Lieutenant John Doe 2, to no avail. Doc. #1, ¶¶ 21–22.

After he arrived at Osborn Correctional Institution ("Osborn") to be placed in segregation, he questioned each officer he encountered why he had been transferred in light of the fact that he had neither been issued a disciplinary report nor undergone a lab test. One officer made a phone call to investigate plaintiff's claim, but the answer was the same: plaintiff was to be transferred pending the results of a lab test. Doc. #1, ¶¶ 25–27. At Osborn, plaintiff was again subject to a visual body-cavity search in front of a camera and multiple DOC staff. Doc. #1, ¶ 30. After plaintiff was placed in his cell, several officers indicated that they would "look into" why plaintiff had been transferred pending the results of a lab test if he had not, in fact, taken a lab test. The next day, plaintiff was issued a Restrictive Housing Unit Status Order for

Administrative Detention, though he still had not received a disciplinary report. Doc. #1, ¶ 40.
Plaintiff remained in the restrictive housing unit until December 23, 2015, when staff transferred
him back to general population. According to plaintiff, "I was placed in Osborn CI population
without any due process of law nor any sanctions," and "[t]hus, clearly violating my clearly
established Eighth Amendment and 14th Amendment [rights]." Doc. #1, ¶ 46. Plaintiff seeks
compensatory and punitive damages.

DISCUSSION

Pursuant to 28 U.S.C. § 1915A(b), the Court must review prisoner civil complaints
against governmental actors and "dismiss . . . any portion of [a] complaint [that] is frivolous,
malicious, or fails to state a claim upon which relief may be granted," or that "seeks monetary
relief from a defendant who is immune from such relief." *Id.* The allegations of a *pro se*
plaintiff's complaint must be read liberally to raise the strongest arguments that they suggest. *See*
*Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010) (discussing special rules of solicitude
for *pro se* litigants).

In recent years, the Supreme Court has set forth a threshold "plausibility" pleading
standard for courts to evaluate the adequacy of federal court complaints. A complaint must allege
enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief.
*See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,
570 (2007). Notwithstanding the rule of liberal interpretation of a *pro se* complaint, a *pro se*
complaint may not survive dismissal if its factual allegations do not meet the basic plausibility
standard. *See, e.g.*, *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

Even assuming a prisoner's complaint alleges facts that plausibly establish a violation of

the prisoner's constitutional rights, not every violation of the Constitution may justify an award of money damages against a correctional official. That is because the doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Carroll v. Carman*, 135 S. Ct. 348, 351 (2014). As the Supreme Court has explained, "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Richard*, 134 S. Ct. 2012, 2023 (2014).

### *Restrictive Confinement and Transfer to New Prison Facility*

Plaintiff alleges that his due process rights were violated when he was subject to administrative segregation and a transfer to a different prison facility without just cause. The Fourteenth Amendment to the United States Constitution provides that a State shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const., Amdt. 14, § 1. The "standard analysis" for a claim of a violation of procedural due process "proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (*per curiam*).[1]

---

[1] Of course, the Due Process Clause protects both a right to "substantive" due process and "procedural" due process. A substantive due process claim requires a plaintiff to show that government officials have deprived plaintiff of a fundamental constitutional right and that they have done so under circumstances that are no less than "arbitrary" and "outrageous," typically as demonstrated by conduct that "shocks the conscience." *See, e.g.*, *United States v. Medunjanin*, 752 F.3d 576, 590 (2d Cir. 2014) (substantive due process has generally protected "matters relating to marriage, family, procreation, and the right to bodily integrity"); *Natale v. Town of Ridgefield*, 170 F.3d 258, 262–63 (2d Cir. 1999) (substantive due process standards violated "only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority"); *Velez v. Levy*, 401 F.3d 75, 93–94 (2d Cir. 2005) (describing the "shocks the conscience" standard). Because the essence of plaintiff's claim is that he should not have

In the prison context (involving someone whose liberty interests have already been severely restricted because of his or her confinement in a prison), a prisoner plaintiff must show that he was subject to an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). In *Sandin*, the Supreme Court concluded that a prisoner who was subject to a disciplinary term of 30 days confinement in restrictive housing did not sustain a deprivation of a liberty interest that was subject to protection under the Due Process Clause. *Id.* at 486.

Following *Sandin*, the Second Circuit has explained that the "factors relevant to determining whether the plaintiff endured an atypical and significant hardship include the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation imposed compared to discretionary confinement." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004). The Second Circuit has further stated that "we have affirmed dismissal of due process claims only in cases where the period of time spent in SHU [special housing unit] was exceedingly short—less than the 30 days that the *Sandin* plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions." *Id.* at 65–66 (citing cases); *see also Prins v. Coughlin*, 76 F.3d 504, 507 (2d Cir. 1996) ("a prisoner generally has no due process right to challenge a transfer from one facility to another").

In light of this framework, it is clear that each of the defendants is entitled at the least to qualified immunity from plaintiff's claim for money damages. Plaintiff was subject to a far less

---

been subject to transfer and restrictive confinement without procedures that allowed him to challenge the basis therefor, I do not understand the complaint to allege a violation of substantive due process distinct from a violation of procedural due process.

lengthy term of restrictive confinement (about eight days) than the plaintiff in *Sandin*, and plaintiff has not alleged anything about either the nature of his short confinement or his transfer to a new prison facility that would support a conclusion that these actions caused him an atypical or significant hardship in relation to the ordinary incidents of prison life. Accordingly, even assuming that plaintiff was mistakenly subject to restrictive confinement and transfer, no objectively reasonable correctional official would have believed that these measures deprived plaintiff of a constitutionally protected liberty interest.

### Strip Searches

The complaint also alleges a violation of plaintiff's constitutional rights when he was subject to two body-cavity searches in front of a camera and in the presence of multiple prison personnel. Numerous courts have concluded that—absent allegations of a strip-search done for invidious reasons of intimidation, harassment, or embarrassment—it does not violate the Constitution for an inmate to be subject to a strip search within the view of other correctional officers or inmates who are not themselves involved in the search. *See, e.g.*, *Walker v. Ponte*, 2016 WL 4411415, at \*4–5 (S.D.N.Y. 2016); *Smith v. City of New York*, 2015 WL 3929621, at \*2–3 (S.D.N.Y. 2015); *see also King v. McCarty*, 781 F.3d 889, 897, 901 (7th Cir. 2015) (*per curiam*) (concluding that "[a] prisoner states a claim under the Eighth Amendment when he plausibly alleges that the strip-search in question was motivated by a desire to harass or humiliate rather than by a legitimate justification, such as the need for order and security in prisons" but that "we do not believe we should expand the scope of Fourth Amendment protection to strip-searches of convicted prisoners to create an Eighth-Amendment-light standard in which the subjective purposes of prison officials would not be relevant.").

Here, plaintiff does not allege any malicious or invidious reason for the searches; rather, the complaint states that the searches took place in connection with disciplinary and transfer actions, and the complaint acknowledges paperwork consulted by defendants reflecting that he was subject to discipline pending lab results. Although plaintiff challenges the factual basis for disciplinary actions taken against him, he does not allege that any of the defendants personally instigated or initiated the discipline taken against him, much less that they did so for malicious or invidious reasons.

In light of these allegations and precedent, it cannot be said that plaintiff's constitutional right to be free from the strip searches he experienced was clearly established and sufficient to overcome defendants' entitlement to qualified immunity. *See Dixon v. Santiago*, 2015 WL 9582729, at *3 (D. Conn. 2015) (granting qualified immunity on claim by prisoner that strip searches "were done in a manner that allowed him to be viewed by a video camera, viewed by other inmates, and viewed by correctional officers who were not involved with the strip search process"). Because I have concluded that plaintiff has failed to allege any constitutional claim for which relief may be granted, I need not consider whether plaintiff has otherwise adequately alleged the personal and culpable involvement of each defendant in the alleged constitutional violation.

### Conclusion

For the reasons set forth above, the complaint is DISMISSED pursuant to 28 U.S.C. § 1915A. Because I conclude that the filing of any amended complaint would be futile in light of the facts already set forth in the initial complaint, this order of dismissal is with prejudice. The Clerk of Court shall close this case.

7

It is so ordered.

Dated at New Haven, Connecticut this 28th day of December, 2016.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge